## PEOPLE v. NEFF.

(Supreme Court, Appellate Division, Fourth Department. November 13, 1907.)

1. COUNTIES—CONTRACTS—CONSTRUCTION.

   Laws 1900, p. 616, c. 277, § 6, providing for the condemnation of a cemetery, declared that within 60 days after confirmation of the commissioners' report the county supervisors should make compensation as awarded by the commissioners, and that in case any person should refuse compensation for lots taken, or should be unknown or incapacitated, etc., his award should be paid into court. Section 7 (page 618) declared that on such payment the title should vest in the people, and that after a specified publication requiring lot owners to remove bodies and monuments, and their failure to do so, such removal and a resetting of monuments should be accomplished by the board of supervisors, the expense so far as possible to be paid by the board from the sums awarded to the owners of lots from which the removal was made, and authorizing the board to acquire sufficient land for that purpose in an existing cemetery

in the county. Under this act the board contracted with C. to remove the unremoved bodies and reset unremoved tombstones, agreeing to pay him the amount of awards allowed by the appraisal commission as to the "damages for taking the lands and removing the said bodies" from the cemetery "for the bodies so removed and reinterred, and for the slabs, stones, and monuments so removed and reset." *Held*, that the act contemplated payment of the land damages before removal of any bodies, leaving under the control of the board of supervisors only such money as remained for the removal and reinterment of the bodies and for the removal and resetting of monuments, and that C. was not entitled under his contract to the awards made for land damages to the owners of lots from which bodies were removed by C., but only to the awards made for the removal of bodies, etc.

2. LARCENY—EVIDENCE—KNOWLEDGE BY COUNTY AUDITOR AS TO RIGHT TO MONEY COVERED BY WARRANT.

In a prosecution of a county auditor, required by Laws 1895, p. 204, c. 173, to audit and report on all claims ordered paid by the board of supervisors, for larceny for auditing and receiving part of the proceeds of claims made against the county by a contractor for the removal of bodies from a cemetery condemned for public use, evidence *held* to sustain a finding that defendant did not believe that the contractor was entitled to land damages awarded to owners of lots from which the contractor removed bodies, and that defendant therefore knew at the time he audited the warrant in question that the contractor had been overpaid.

3. SAME—EVIDENCE—AIDING AND ABETTING—CONSPIRACY.

In a prosecution of a county auditor for larceny, evidence *held* to sustain a finding that defendant entered into a fraudulent conspiracy with certain others to steal from the county, and that defendant aided and assisted by auditing a warrant for the payment of a fraudulent claim against the county, and participated in the proceeds.

4. STATUTES—RE-ENACTMENT—AMENDMENT.

Code Civ. Proc. § 234, authorizing the Governor to appoint extraordinary terms of the Supreme Court, was re-enacted by its amendment in 1895 (Laws 1895, p. 808, c. 946, § 234).

5. COURTS—SUPREME COURT—TRIAL AND SPECIAL TERMS—CONSTITUTIONAL PROVISIONS.

Const. 1894, art. 6, § 2, providing that the Appellate Division in each department may fix the times and places for holding Trial and Special Terms, as amended in 1905, so as to authorize such justices to fix the times and places "for holding Special Terms," does not prohibit the justices of the Appellate Division from appointing "Trial and Special Terms," conferred by Code Civ. Proc. § 232, as amended by Laws 1895, p. 808, c. 946.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, § 207.]

6. SAME—EXTRAORDINARY TERMS—CONSTITUTIONAL PROVISIONS.

Code Civ. Proc. § 234, authorizing the Governor to appoint extraordinary terms of the Supreme Court, having been amended in 1895 (Laws 1895, p. 808, c. 946, § 234), its validity must be tested by the Constitution as it existed at that time, and was not affected by the constitutional amendment approved at the general election in 1905, which became effective January 1, 1906.

7. SAME—EXTRAORDINARY TERMS—APPOINTMENT BY GOVERNOR.

The Governor was authorized by Code Civ. Proc. § 234, to appoint an extraordinary Trial Term of the Supreme Court, notwithstanding Const. art. 6, § 2, providing that the Appellate Division justices of each department shall have power to fix the times and places for holding Trial and Special Terms and assign the justices to hold the same and make rules therefor.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, § 227.]

**8.** CRIMINAL LAW—CHANGE OF VENUE—PROCEDURE—DISCHARGE OF JURY—OBJECTIONS—WAIVER.

After the jury had been impaneled and sworn, and before any evidence had been given in a prosecution for larceny in which the venue had been changed, it was discovered that the order removing the cause had not been entered in the clerk's office of the county in which the trial was had, under Code Cr. Proc. § 353, providing that such an order is ineffective unless a certified copy be filed as required by section 351, before a jury is sworn to try the indictment. Defendant, though not receding from his position that the court was without jurisdiction, stated that he was willing to waive the question; but the court discharged the jury. *Held,* that defendant could not thereafter complain of the discharge of the jury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 259.]

**9.** JURY—ADDITIONAL JURORS—NEW PANEL.

Where the court discharged a jury drawn and sworn, because a certified copy of the order changing the venue had not been filed in the office of the county where the trial was had, the court was authorized by Code Civ. Proc. §§ 1058, 1059, to draw additional jurors to constitute a new jury to try accused, which jury did not constitute a new panel, required to be drawn in the manner prescribed by sections 1042, 1043.

**10.** CRIMINAL LAW—FORMER JEOPARDY—DISCHARGE OF JURY.

Where, after a jury had been drawn and sworn, it was discharged, before any evidence had been introduced, because a certified copy of an order changing the venue had not been filed in the county where the trial was had, such proceedings did not constitute jeopardy, precluding a subsequent trial, under Code Cr. Proc. § 430, providing that where a jury is discharged by accident or other cause, except where the defendant is discharged from the indictment during the progress of the trial or after the case is submitted, the cause may be again tried at the same or another term.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 330.]

**11.** COUNTIES—TREASURER—PAYMENT OF MONEY—WARRANTS.

A county treasurer is protected in paying out money belonging to the county by a proper warrant, though its purpose is to defraud the county, unless the treasurer is a party to the fraud or has knowledge thereof.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Counties, § 254.]

**12.** SAME—COUNTY FUNDS—TITLE—FRAUDULENT WARRANT—PAYMENT.

Payment of county funds by the county treasurer on a fraudulent warrant was not effective to transfer title to the persons who thus obtained the money, nor to give them any right to possession thereof.

**13.** LARCENY—TRICK OR DEVICE—FALSE PRETENSES.

Where defendant, a county auditor, and his co-conspirators, obtained money from the county to which they were not entitled by a fraudulent warrant drawn by the auditor, such warrant, though valid on its face, was a mere trick or fraudulent device for obtaining the money, and did not change the offense from larceny to false pretenses, under the rule that larceny at common law is established by proof that defendant obtained possession of the property animo furandi by some trick, fraudulent device, or artifice, with the intention of appropriating it to his own use.

Robson, J., dissenting.

Appeal from Trial Term, Wyoming County.

John W. Neff was convicted of grand larceny in the first degree, and he appeals. Affirmed.

The defendant, John W. Neff, was indicted jointly with Rowland J. Conover for the crime of grand larceny in the first degree, alleged to have been committed on the 1st day of October, 1901, charging them with stealing $7,-

500 in money, belonging to the county of Erie. The defendants were tried separately. Conover was tried and convicted at the Erie Trial Term, and Neff was tried at the Wyoming Trial Term; he having made a motion to remove the action from Erie county, which was granted, and the place of trial changed to Wyoming county. He was tried at an extraordinary term appointed by the Governor, in July, 1906. The indictment contained a second count, also charging the crime as receiving stolen property; but that count was withdrawn from the consideration of the jury, and the defendant was convicted upon the first count, charging the offense as grand larceny in the first degree. Motions by the defendant in arrest of judgment and for a new trial were denied, and the defendant was sentenced to imprisonment for the term of seven years.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

William B. Hoyt, for appellant.
Frank A. Abbott, for the People.

KRUSE, J. The moneys which the defendant was convicted of stealing were obtained from the county treasurer, the legal custodian thereof, by means of a warrant signed by the clerk of the board of supervisors, and countersigned by the chairman of the board and the defendant Neff, the county auditor, payable to the order of the defendant Conover. The warrant was in due form, and signed and countersigned by the proper officers.

It is contended on the part of the prosecution that Conover had no right to the moneys so obtained on the warrant, which fact was well known to both Neff and Conover; that the warrant was a mere device by which to defraud the county of its money and appropriate the same to the use of themselves and others associated with them in the commission of the crime. On behalf of the defendant it is contended that he acted in good faith in countersigning the warrant, believing that Conover was legally entitled to the moneys which were obtained thereon, and that in fact the county was at that time indebted to Conover in a sum exceeding that amount, upon a contract which Conover had with the county for the removal of bodies from an old cemetery, situate in the city of Buffalo, to a new cemetery, owned by a corporation of which Conover was an officer. On the 26th day of March, 1901, Conover entered into this contract with the board of supervisors of Erie county. The contract was made under the provisions of chapter 277, p. 614, of the Laws of 1900, which was passed to enable the acquisition of the old cemetery lands by condemnation for an armory site. The act empowered the board of supervisors, with the approval of the armory commission of the state, to take proceedings to acquire the lands for that purpose. The Supreme Court was empowered to appoint three commissioners to appraise the damages for taking the lands and the damages accruing to the owners of lots by reason of the removal of the remains, requiring the damages for taking the lands to be considered and reported apart from the damages for the removal and reinterment of the remains and resetting the slabs, stones, and monuments. The board of supervisors was directed to publish a notice for 3 weeks, as therein prescribed, requiring the owners of lots within 30 days to remove the remains of persons buried therein. At the expira-

tion of that time the board of supervisors was directed to cause the removal and reinterment of all such bodies then remaining in the cemetery lands, and the removal and resetting of the slabs, stones, and monuments; the expense thereof to be paid, as far as possible, from sums awarded to the owners of lots from which the removal is made. To carry out the provisions of the act the board of supervisors was empowered to issue bonds from time to time, to be sold by the treasurer of the county; the proceeds to be paid out upon the order of the board. On March 20, 1901, the board of supervisors adopted the following resolution:

"Resolved, that upon the expiration of the period of thirty days allowed for the removal and reinterment of the bodies in the cemetery in the city of Buffalo, described as follows: [Describing the cemetery]—that the board of supervisors cause the removal and reinterment of all of the bodies remaining in said cemetery lands at the expiration of such period of thirty days, and cause the same to be reinterred under the supervision of and subject to the orders of the board of health of the city of Buffalo, and cause the monuments, stones, and slabs remaining therein to be removed and reset; all to be removed and reinterred and reset in the Lakeside Cemetery, in the town of Hamburg, in the county of Erie: provided, said Lakeside Cemetery shall execute to the county of Erie a conveyance of sufficient lands in its cemetery for the removal thereto and reinterment therein of the said bodies, and the removal thereto and resting therein of said slabs, stones, and monuments; and provided, further, that R. J. Conover, comptroller of the said Lakeside Cemetery Association, shall execute to and with the county of Erie an agreement to convey said lands, and to remove and reinter said bodies, and to remove and reset said slabs, stones, and monuments at his own expense and in such manner as to preserve the identity of said body as far as possible, and, in all cases where the remains of any body are distinguishable, to reinter the same in a separate grave; the county to pay to the said R. J. Conover, comptroller of the Lakeside Cemetery Association, in consideration thereof, the amount of the awards allowed by the commission heretofore appointed as the damages for taking the lands and removing the said bodies from the so-called North Street Cemetery, for the bodies so removed and reinterred, and for the slabs, stones, and monuments so removed and reset."

On the 26th day of March, 1901, a contract was entered into by Conover with the county. After reciting in full the resolution just referred to, it provided that Conover should remove and reinter the bodies remaining in the cemetery, remove and reset all slabs, stones, and monuments in the Lakeside Cemetery at his own expense, and in such manner as to preserve the identity of each body as far as possible, and, in all cases where remains of any body are distinguishable, to reinter the same in a separate grave. He further agreed that the Lakeside Cemetery Association would execute to the county a conveyance of sufficient lands in its cemetery for the removal thereto and the reinterment therein of the bodies upon completion of said work. Upon its part the county agreed as follows:

"The party of the second part, in consideration thereof, agrees to pay to the party of the first part the amount of the awards allowed by the appraisal commission in its report heretofore confirmed by the Supreme Court of Erie county as to the damages for taking the lands and removing the said bodies from the North Street Cemetery, for the bodies so removed and reinterred, and for the slabs, stones, and monuments so removed and reset."

Defendant's counsel asked the court to charge that, under the contract, Conover was entitled to land awards made by the commissioners

for all the lots from which Conover removed bodies. The court declined, and charged the jury as a matter of law that under his contract Conover was not entitled to the land awards. Counsel for the defendant excepted to the refusal to charge as requested, and to the charge as made, and urges that such a construction not only does violence to the language of the contract itself, but that the interpretation contended for by the defendant is the more reasonable one, since Conover was required not only to remove the remains and reinter them, and remove and reset the slabs, stones, and monuments, but also to furnish the land for that purpose; that, even assuming that the trial judge was right in holding that the lot owners had such an interest in their lots as entitled them to compensation beyond the furnishing of another burial place, and that as between the county and the lot owners the awards for land damages belong to the owner, yet that it was entirely competent for the county to contract, and it did contract, to pay to Conover a sum equal to the total amount awarded to the lot owners, including the damages for taking the lands from which Conover removed the unclaimed dead. There is much force in this contention, and I confess that my first impression upon the argument was that such was the interpretation to be placed upon the provision of the contract relating to the compensation to be made to Conover. But upon a careful reading of this provision, in connection with the act under which the old cemetery was acquired, the report of the appraisal commission, and the surrounding circumstances, I think the trial judge was right in his interpretation of the contract. The contract itself was made in reference to the provisions of the act, as the act is referred to therein.

After the awards had been made, and the commissioners' report filed and confirmed, and simultaneous with the passing of the resolution authorizing the making of the contract with Conover, the board of supervisors directed an issue of bonds, of $210,000, which was the amount necessary to pay the awards fixed by the court in confirming the report of the commissioners and the expenses incurred up to that time. The commissioners, in their report, had made awards for removing and reinterring the bodies, and removing and resetting the slabs, stones, and monuments, fixing the uniform sum of $9 for removing a body and $6 for reinterring the same. The amount for removing the slabs, stones, and monuments, and resetting the same, varied. They had also made separate awards, as the act provided, for the damages for taking the land and for removing and reinterring the remains. The act provided that the bonds were to be sold by the county treasurer, and the proceeds retained by him and paid out upon the orders of the board. Section 6 of the act (Laws 1900, p. 616, c. 277, § 6) provides:

"* * * Within sixty days after the confirmation of the report of the commissioners, the board of supervisors shall make to the persons to whom compensation shall have been awarded by the commissioners, the compensation awarded to them respectively, except as hereinafter otherwise provided. In case any such person shall refuse such compensation, or shall be unknown or incapacitated, or the right to the compensation be disputed or doubtful, the board of supervisors may pay the same into court with a statement of the facts and circumstances of the case."

Section 7 provides:

"Upon paying either to the persons entitled thereto or into court the amounts separately awarded as damages for taking said lands, the title thereto shall vest in the people of the state of New York in fee. After the making of such payment the board of supervisors shall publish a notice twice a week for three weeks in the official paper and two other daily papers of said county requiring the former owners of lots in said cemetery to remove the remains of persons buried in such lots and to remove the monuments, slabs and stones on said lots, and suitably reinter such remains and reset such monuments, slabs and stones within thirty days from the first publication of such notice; such removal, reinterment and resetting shall in all cases be done under the supervision and subject to the orders of the board of health of the city of Buffalo, and when in any case the health commissioner of said city shall certify that the same has been properly accomplished the board of supervisors shall direct the payment or deposit in court of the further sum awarded in such case for that purpose."

Then follows section 8, which provides that the board of supervisors shall cause the removal and reinterment of the bodies remaining after the expiration of the time during which former lot owners are required to make the removal, and that the expense of such removal, reinterment, and, resetting shall be paid by the board, as far as possible, from the sums awarded to the owners of lots from which the removal is made, and empowers the board to acquire sufficient land for that purpose in one of the existing cemeteries in the county.

It will thus be seen that the act contemplates, before any removals are made, that the awards for the land damages shall be paid to the persons entitled thereto, or into court, and the only moneys remaining under the control of the board of supervisors, realized from the proceeds of the sale of bonds, are the awards for the removal and reinterment of the bodies and for the removal and resetting of the monuments. Those awards are to be paid to the lot owners, where they do that work. Where it is not done by the lot owner, the board of supervisors is to use the amount of the award in meeting the expenses of causing the work to be done. It would seem, therefore, that those are the awards referred to in the contract, that the words "as to the damages for taking the lands and removing the said bodies from the North Street Cemetery," contained in the contract, are mere words of description of the report containing the awards, and that the amount of the awards to which the defendant Conover is entitled is the awards allowed "for the bodies so removed and reinterred, and for the slabs, stones and monuments so removed and reset."

It is true, as urged by counsel for the defendant, that although the awards for land damages may belong to the landowners, yet that the board of supervisors could contract to pay a sum equal to the awards, including the land damages. The difficulty with that suggestion is that the contract does not so provide, and we think it is not susceptible to that construction, as we have pointed out.

2. The trial court charged the jury that if the defendant honestly believed that under the contract Conover was entitled to the land awards made by the commissioners for lots from which he removed the bodies, and the payments made by the defendant were intended to apply in part upon land awards to which he believed Conover entitled, he (the defendant Neff) could not be convicted, but declined to charge

106 N.Y.S.—48

that the evidence showed that fact, leaving that question to be determined by the jury upon the evidence, and giving the defendant an exception to the refusal to charge as requested. The jury found against the defendant, and we think the evidence sustains that finding.

. The act for acquiring the old cemetery became a law on the 4th day of April, 1900. The resolution of the board of supervisors to acquire the lands was adopted on or about April 24, 1900. On May 18, 1900, the order was made appointing the commission of appraisal. Soon after the act became a law, and before the appointment of any commissioners, Neff called the attention of Conover to the law, and thereafter, and a day or two before the commissioners were appointed, Neff, with either Gibson or Jackson, went to Conover's office and talked about the men who were mentioned as commissioners. Neff, Gibson, and Jackson were there several times during the year after that. Upon one occasion, some two or three months after the commission had been appointed, in September or October, Neff, Gibson, and Jackson came to Conover's office and discussed the possibility of removing the bodies to the cemetery owned by the association with which Conover was connected; one of the three saying that it could be done, but would cost money. Conover testifies that he replied that his funds were tied up in the Lakeside Cemetery, and that he had none to spend for that purpose. Soon after, and after the first report of the commissioners (which is dated November 7, 1900), Neff, Gibson, and Jackson went to Conover's office again, and a computation was made from the awards made by the commission. The sum awarded to the cemetery association, and to the city for taxes and some expenses, was deducted from the total awards, and the balance divided by the number of bodies estimated, making the average of $24.42 per body. It was agreed among them that Conover was to have $18 per body, and the other three $6.42 per body.

On November 2, 1900, and after the talk with Neff, Gibson, and Jackson that it would take money to get the contract, Gibson and Jackson went to Conover's office, and it was then mentioned that $5,000 would be necessary to be raised for the use of the board of supervisors, and Conover made his note for that amount, payable to the order of Jackson, due in eight months, with interest, assigning as collateral security a certificate of indebtedness of the Lakeside Cemetery Association for $5,000, of which Conover was the holder. Thereafter Neff interested Stock, who was a member of the military committee of the board of supervisors, in the matter. He called Stock into his private office and stated that there was a contract to be let to Conover; that Conover would receiver $15 a body, retaining $9 for himself, and giving to Neff, Gibson, Jackson, and Stock $6; that he (Neff) figured out the amount of money on the basis of about 4,000 bodies at $6 per body. The amount of some of the warrants thereafter issued to Conover seems to be at that rate, $15 a body, as will appear later. Stock testifies to various meetings, had thereafter between himself, Neff, Gibson, and Jackson, where money was divided among them, and admits that he received $1,000. On March 15, 1901, Conover made four assignments in blank of certain amounts out of warrants to be issued to him. The assignments were all acknowledged as having

been executed by Conover on that day, but one of them does not appear to have been signed by him. Each assignment recites that Conover is about to enter into a contract with the county of Erie to remove the unclaimed dead from the cemetery, and to be paid therefor in warrants drawn upon the treasurer, in accordance with the report of the appraisal commission, as confirmed by the Supreme Court. One of the assignments transferred $5,000 out of the warrant to be issued for the removal and reinterment of the first 1,000 bodies. The other three were each for $5,750, one payable out of warrants for the second 1,000 bodies, another out of warrants for the third 1,000 bodies, and the third payable out of warrants for the fourth 1,000 bod'es. The day before the contract was made with Conover, Jackson exacted the discount on the $5,000 note, and Conover executed another note, dated March 25, 1901, for $262.50, at three months, which was paid by Conover's check on the Niagara Bank of Buffalo, dated June 12, 1901, for that amount, and payable to the order of Jackson. Thereupon, and on the 26th day of March, the resolution was passed awarding the contract to Conover, by the board of supervisors, of which Gibson, Jackson, and Stock were members. On the 22d of May, 1901, the 30 days for the removal of the unclaimed dead expired, and the following day Conover commenced taking up the remaining bodies.

It may be well now to call attention to the duties of Neff as county auditor. The statute creating the office of county auditor of Erie county (chapter 173, p. 204, Laws of 1895) requires the county auditor to examine and report upon all accounts or claims against the county before the same shall be audited and ordered paid by the board of supervisors. He is required to ascertain whether the claims are just, whether the prices charged are just and true, and whether the work has been performed and the material delivered, attaching his certificate stating the result of his examination, and, if he advises that the claim be rejected or modified, give his reasons therefor; the claims, with his certificate, to be filed in his office, and during office hours open to public inspection. The usual course of business in passing upon and paying the Conover claims was for Conover to present his claim in writing, and the auditor, after passing on the claim, certified to the amount to which Conover was entitled, and thereupon a warrant was drawn, signed by the clerk of the board of supervisors, and countersigned by the chairman of the board and the county auditor, who was the defendant Neff. On June 4, 1901, a certificate was produced, countersigned by Neff, the auditor, certifying that there was due Conover the sum of $75 for removal award. On the next day a warrant was drawn in the usual form for $7,500. A check was drawn therefor by the deputy county treasurer. It was paid in currency, as is indicated by the markings on the back of the check, as testified to by the cashier employed in the office of the county treasurer. Although the warrant appears to be indorsed by Conover, he denied having the money, or even having any recollection of presenting the warrant. It should be stated, in this connection, that before entering upon the performance of his contract Conover had made removals for lot owners, and their awards were assigned to him, which may be a possible explanation for the certificate of June 4, 1901, for $75. However, no

claim for the $7,500 warrant, or certificate of the auditing thereof, could be found in the office of the auditor; at least, none was produced at the trial.

On June 11, 1901, Conover made a claim for the removal of 1,200 bodies, and on that day a warrant was drawn in the usual form for $29,304, payable to the order of Conover. He testifies that the only claim he made was for the 1,200 bodies; that, after the warrant was signed and countersigned, Neff took it and started to go down to the county treasurer's office, but, some one desiring to see Neff, he handed the warrant to Gibson, and asked him to go down to the county treasurer's office; that Gibson, Jackson, and Conover went to the county treasurer's office, and into the room of the deputy county treasurer, who was absent, and there Gibson made a computation upon a card, figuring 1,200 bodies at $6.42, and also insisted that Conover pay at the same rate for 600 bodies, being the private removals made by Conover, but Conover refused to make such an allowance, and finally it was agreed that for the 600 bodies there should be allowed $5.75 a body; that the two sums, making in all $11,154, were deducted from the amount of the warrant, $29,304, leaving Conover $18,150; that, in looking over the figures, Gibson stated that it did not come out right, but that they would let it go that way. The card containing the computation was produced on the trial. After the deputy treasurer came, two checks were drawn on the Columbia National Bank, to the order of Conover, one for $11,154, and another for $18,150. Both were indorsed by Conover. Conover further testified that he did not indorse the warrant; that Neff had it; that he never made any claim on the county for the amount of $29,304; that he took the $18,150 check, and deposited it to his credit in the Niagara Bank of Buffalo; that the other check, of $11,154, he left lying on the desk; that Neff came in before he left the room. The currency was obtained the next day on the $11,154 check, by Jackson or Gibson, at the Commercial Bank, without their indorsement. On the 25th of June, 1901, Conover presented a claim for 1,000 bodies, and a warrant for $15,000 was drawn. Neff, Gibson, and Jackson went to the treasurer's office with Conover, and there two checks were drawn, one for $10,000, and one for $5,000. Conover took the $10,000 check, and left the $5,000 check. On July 9th Conover presented a claim for 1,000 bodies, and a like division was made as on June 25th.

The work of removing the bodies was completed on August 2, 1901, according to the last report of one of the inspectors. Conover testifies that on the 6th day of August it was completed in a general way, with the exception of some bodies that were found afterwards in excavating. On that day Conover presented a claim for 558 bodies, making a total of 3,758 bodies up to that time, for which he had presented claims. Conover went to the auditor's office, and, as usual, Jackson and Gibson went to the treasurer's office with him. A warrant dated that day for $7,800 was produced, bearing the indorsement of Conover; but Conover insists that it was not the one taken to the treasurer's office. Another warrant was produced, bearing the same date, for $6,000, likewise made payable to the order of Conover, which Conover indorsed. A treasurer's check for $7,800, payable to the or-

der of Conover and indorsed by him, was produced; but he disclaimed having any recollection of the check. Two other checks were produced, dated August 6, 1901—one for $3,450, and another for $2,550, making up the amount of $6,000 warrant. He took the former check and left the latter. On the 1st day of October, 1901, another warrant of $7,500 was issued, payable to the order of Conover. If Conover was not entitled to the land awards, he had before that time been overpaid upwards of $20,000. The moneys were obtained from the county treasurer upon this warrant of $7,500, and it is this transaction for which Conover and Neff were indicted and convicted. Conover testifies that he did not receive the warrant; that he first saw the warrant in Neff's office; that Neff, Gibson, and Jackson were present; that he first saw the warrant in Neff's hands, and Neff handed it to Gibson or Jackson; that the warrant was taken to the county treasurer's office; and that Neff, Gibson, and Jackson were present with him. Two treasurer's checks were issued on the Columbia National Bank—one for $3,086 and another for $4,414—for the warrant. The smaller check was taken by Conover, and the one for the larger amount was left lying on the desk. Both checks were paid out of moneys belonging to the county. Conover testifies that he has no recollection of making any claim for that warrant, and has no record of having done so, and no claim was produced therefor upon the trial.

There are other facts and circumstances, but sufficient, I think, has been detailed to show that the jury were well warranted in finding against the claim, made on behalf of the defendant, that he honestly believed that Conover was justly entitled to the $7,500, for which this warrant was drawn, and upon which this indictment is founded. We think the evidence establishes that Neff, Gibson, Jackson, and Stock entered into a conspiracy to defraud the county; that a combination was formed by them with a common purpose to steal the money of the county; and that the scheme was deliberately planned and successfully executed. While it is true that the testimony of Conover and Stock, who were accomplices, was relied on to establish the guilt of the defendant Neff, the overt acts proven and the corroborating evidence are such, we think, that the jury was entirely justified in finding that there was such illegal combination, and that the defendant Neff was connected therewith, and aided and assisted in stealing the money of the county.

3. The defendant also challenges the legality of the court which tried him and the jury which convicted him. As regards the point that the court was not legally constituted, it appeared that it was an extraordinary term appointed by the Governor, and it is now urged that the provision of section 234 of the Code of Civil Procedure, authorizing the Governor to appoint extraordinary terms of the Supreme Court, was abrogated by the last state Constitution; that although that section was amended in 1895 (Laws 1895, p. 808, c. 946, § 234), and thus re-enacted, it, being in contravention of the Constitution, was void. Of course, if this section is at variance with the Constitution, it is of no force. Section 2, art. 6, of the Constitution of 1894, upon which counsel for the defendant bases his claim, provides that the justices of the Appellate Division in each department shall have the power

to fix the times and places for holding Trial and Special Terms, and assign the justices to hold such terms, or make rules therefor. This section was amended in 1905, so as to permit any justice of the Appellate Division, when not actually engaged in performing the duties of such appellate justice in the department to which he is designated, to hold any term of the Supreme Court, and exercise any of the powers of a justice of the Supreme Court, in any county or judicial district in any other department of the state, and in making that amendment the provision contained in that section for fixing the times and places for holding Special and Trial Terms seems also to have been amended, through inadvertence or otherwise, by eliminating from that provision the words "and trial," so that the provision now reads:

"The justices of the Appellate Division in each department shall have power to fix the times and places for holding Special Terms therein, and to assign the justices in the departments to hold such terms, or to make rules therefor."

While the amendment does not affect the power of the Appellate Division justices to appoint Trial and Special Terms, conferred by section 232 of the Code of Civil Procedure, as amended in 1895, it would seem to remove whatever ground existed for the claim that the Constitution contemplated that the Appellate Division justices should have exclusive power to make such designations, so far as relates to Trial Terms.

The amendment to the Constitution, however, does not affect the question here presented, since the amendment was after the re-enactment of section 234 of the Code of Civil Procedure, which contains the provision authorizing the Governor to appoint extraordinary terms of the Supreme Court; the amendment to the Constitution having been approved at the general election in 1905, becoming effective on the 1st day of January, 1906, while section 234 was amended in 1895, and its validity must be tested by the Constitution as it was at that time. The precise question now raised by counsel for the defendant was decided adversely to his contention by the Appellate Division in the Second Department in 1897, in the case of People v. Young, 18 App. Div. 162, 45 N. Y. Supp. 772, by a unanimous decision. It was there held that the power given to the Appellate Division by the Constitution was not in conflict with the power of the Governor to appoint extraordinary terms. It has been the uniform practice of all of the Governors, since the adoption of the Constitution, to exercise this power, and, while we recognize the force of the argument of counsel for the defendant to the contrary, we are not convinced that the Governor did not have that power.

After the first jury was impaneled and sworn, and before any evidence was given, it was discovered that the order removing the action to Wyoming county had not been entered in the clerk's office of that county. Section 353 of the Code of Criminal Procedure provides that such an order is of no effect unless a certified copy thereof be filed, as required by section 351, before a juror is sworn to try the indictment. When thus filed the court to which the action is removed must proceed to trial and judgment therein. Section 351 provides that, if the Supreme Court order the removal of the action, a certified copy of

the order for that purpose must be delivered to and filed with the clerk of the court where the indictment is pending, who must thereupon transmit the same, with the pleadings and proceedings in the action, including all undertakings for the appearance of the defendant or of the witnesses, or a certified copy of the same, to the court to which the action is removed. The drawing of the jury was finished on July 17, 1906, and the panel was sworn. At the opening of court on the next day counsel for the defendant stated that no certified copy of the order of removal had been filed with the court, or the clerk thereof, and consequently the court had not jurisdiction. The question was discussed as to whether the order had been filed. The clerk of the court and his deputy were sworn, showing that no such order had been filed with them. A copy of the order, which had been served upon the counsel for the defendant by the district attorney, was examined by the court, and a recess was taken until later in the day. After the recess counsel for the defendant stated that the defendant would waive the question of jurisdiction, but the court stated that the statute seemed to be imperative, and, in view of the position of the defendant's counsel, he would discharge the jury, and the jury were discharged accordingly.

It will be observed that the defendant's counsel did not recede from his position that the court was without jurisdiction to try the defendant, but stated that he was willing to waive that question. What the effect would have been, had the defendant persisted in his objections and the trial continued before the first jury, we need not determine, since that question is not now in the case. We think, under the circumstances, the defendant cannot be heard to complain of the course adopted by the trial court in discharging the first jury.

After the first jury was discharged it became necessary to draw additional jurors, which counsel for the defendant objected to upon the ground that it was practically drawing a new panel, without observing the provisions of sections 1042 and 1043 of the Code of Civil Procedure. We think the court had power to draw the additional jurors. See Code Civ. Proc. §§ 1058, 1059.

Neither do we think that what was done before the first jury was an independent trial, so that by discharging the jury it exonerated the defendant from further prosecution and trial, under the provisions of the Constitution that no person shall be subject to be twice put in jeopardy for the same offense (Const. N. Y. art. 1, § 6), as contended by the defendant. There was but one trial. The jury was discharged for the reasons which have been stated, and we think, even if the case had gone over the term, as was requested by counsel for the defendant, it would not have prevented another trial. Section 430, Code Cr. Proc.; People v. Cignarale, 110 N. Y. 23, 17 N. E. 135; People v. Smith, 172 N. Y. 210, 64 N. E. 814.

It is further contended on behalf of the defendant that there is a fatal variance between the proof and the indictment, which is in form a common-law indictment for larceny; that the charge of larceny as stated in the indictment was not proven; that, if any offense was proven, it is what was formerly known as "obtaining money under false pretenses," and not larceny as defined by the common law and the Revised Statutes before the Penal Code was enacted, making the

offense of obtaining money or property under false pretenses larceny. We think this objection was not well taken. The county treasurer was a mere custodian of the money of the county to be paid out only for legitimate purposes. While he would be protected in paying it out under a proper warrant, even if its purpose was to cheat and defraud the county, unless he was a party to the fraud or had knowledge of it, payment upon fraudulent warrants did not have the effect to transfer the title to the money to the persons who thus wrongfully obtained it, nor give them any right to the possession thereof. The warrant was a trick or fraudulent device for obtaining the money. It was as much a theft as it would have been had the defendant secretly, and without the knowledge or consent of the county treasurer, taken it from the safe. The defendant was not entitled to the possession thereof, either individually or in his official capacity.

It was early held under the common law that where the custodian of a quantity of wheat permitted a defendant to take the key to the storehouse and remove a quantity of wheat, upon his representation to the custodian that he had been sent by the owner to take the wheat, and the representation was false, and he subsequently disposed of the wheat, the defendant was guilty of larceny. Reg. v. Robins, 29 Eng. L. & Eq. 544. Judge O'Brien, in the late case of People v. Miller, 169 N. Y. 339–350, 62 N. E. 418, 421, 88 Am. St. Rep. 546, says:

"The offense of larceny at common law is established by proof on the part of the prosecution showing that the defendant obtained possession of the property by some trick, fraudulent device, or artifice, animo furandi, with the intention at the time of subsequently appropriating it to his own use. This proposition is well sustained by authority in this and other courts, both before and since the enactment of the Penal Code."

We have overlooked none of the objections and exceptions urged on behalf of the defendant for reversing the judgment. We think none of them would justify the granting of a new trial. A careful reading of the evidence convinces us that the jury were well warranted in finding the defendant guilty of the offense with which he was charged and that he was properly convicted.

The judgment should be affirmed. All concur, except ROBSON, J., who dissents.