### PEOPLE v. LEIN.

(Supreme Court, Appellate Division, Fourth Department. July 9, 1912.)

1. LARCENY (§ 55*)—SUFFICIENCY OF EVIDENCE.

   Evidence on prosecution for larceny of money, the property of a town, paid on a fraudulent claim by contractors for extra work in construction of a sewer system, defendant being the town supervisor, and the custodian of the sewer fund, and the warrant having been signed by him, *held* to show his guilt.

   [Ed. Note.—For other cases, see Larceny, Cent. Dig. §§ 152, 164–169; Dec. Dig. § 55.*]

2. CRIMINAL LAW (§ 511*)—CORROBORATION OF ACCOMPLICE—SUFFICIENCY.

   Within Code Cr. Proc. § 399, prohibiting conviction on the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect defendant with the commission of the crime, *held*, there was sufficient corroboration on prosecution of a town supervisor, custodian of its sewer fund, of larceny of its money, paid on a fraudulent claim by contractors for extra work in construction of a sewer system.

   [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1127–1137; Dec. Dig. § 511.*]

3. LARCENY (§ 15*)—EMBEZZLEMENT OR COMMON-LAW LARCENY.

   Though the supervisor of a town, custodian of its sewer fund, might be convicted of larceny in the form of embezzlement, he may also be convicted on an indictment for common-law larceny, where, pursuant to a conspiracy, of which he is a party, money of the fund is paid out on his warrant, on a fraudulent claim by contractors for extra work in construction of a sewer system.

   [Ed. Note.—For other cases, see Larceny, Cent. Dig. §§ 39–42; Dec. Dig. § 15.*]

Appeal from Trial Term, Erie County.

Henry C. Lein was convicted of grand larceny, first degree, and appeals. Affirmed.

Argued before McLENNAN, P. J., and SPRING, KRUSE, ROBSON, and FOOTE, JJ.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

John W. Ryan, of Buffalo, for appellant.
Guy B. Moore, of Buffalo, for respondent.

KRUSE, J. The defendant was indicted by the grand jury of Erie county upon two counts: (1) Accusing him of the crime of grand larceny committed on the 10th day of April, 1908, at the city of Buffalo, in that county, in stealing $2,690 in money, the property of the town of West Seneca, charged in the form of common-law larceny; (2) of criminally receiving as stolen property the same money. At the close of the people's case, the second count was dismissed; but the several motions made during the progress of the trial to dismiss the first count were denied, and the defendant was convicted of larceny upon that count.

[1] The money which the defendant was convicted of stealing was paid upon a fraudulent claim made by the contractors for extra work in connection with the construction of a sewer system for the town of West Seneca. Henry C. Lein, the defendant, was the supervisor, and custodian of the fund. Lawrence Savage, of Lawrence Savage & Co., the contractors, was one of the principal characters in the conspiracy to defraud the town. Savage had been tried and found guilty of the crime of grand larceny, but had not been sentenced at the time of the trial of this case, and was called by the prosecution and gave testimony of the conspiracy. Upon his testimony the conviction of Lein largely rests. The town funds had been deposited in the Union Stockyards Bank of Buffalo. Savage had made several attempts to have this fictitious claim allowed, but had been unsuccessful. Finally, on March 26, 1908, a claim for $3,375.92 was allowed to the contractors, the balance of their claims for extra work, and an order or check was drawn on the bank, dated that day, for that amount, drawn in the name of the town as maker and executed by the supervisor and town clerk.

After that, as the story is related by Savage, John W. O'Connor, a young lawyer and one of the justices of the peace of the town, and a member of the town board, about the 4th to the 7th of April, as Savage states, came to Savage, and said that the boys needed some money up there at West Seneca, to which Savage replied that he did not know how it could be arranged, and that he would have a talk with the supervisor, and see him in a day or two. Savage says he met O'Connor again two or three days or three or four days before the 10th of the month, and that he (Savage) and O'Connor went to Lein's house in Gardenville and met Lein; that they talked about the concrete in the well; that O'Connor said there was a way of getting some money. "You know," he said, "you have been turned down. That estimate on the well for extra concrete has been turned down and the engineer will never allow it, and we might as well divide that up among the boys." To which Lein replied, "Yes; pluck all the apples on the tree while they are ripe." O'Connor called up Murphy, the town engineer, on the telephone, and Savage says he heard O'Connor tell Murphy that he was going to send a couple of men down there, and that anything those men would tell him had to go, and that about three minutes

thereafter Lein called up Murphy on the phone, and told him that he was going to send down a couple of men, and anything those men might tell him was coming from the board, and he was to get busy and do what he was told.

O'Connor and Savage left Lein's place, and afterward met Evans, an attorney who represented the contractors. Savage and Evans saw Murphy at his office in Ellicott Square, in Buffalo. Evans told Murphy that the boys were getting kind of hungry and wanted some money. Murphy said, "How do you intend to raise any money?" Evans said, "Why, we intend to raise some money on an estimate for that concrete in the well." Murphy said, "Then, in other words, you want to steal it from the town?" · Evans said, "No; I wouldn't put it in that way." Murphy said, "Well, if them fellows want any money, want me to do anything crooked, they had better get another engineer." But Savage says that after some further talk Murphy agreed to make the estimate and took a piece of paper and figured out an estimate. But Murphy did not hand the estimate to Savage or Evans at that time.

On the 9th day of April, 1908, a meeting of the town board and the highway commission was ·held, at which were present Lein, the supervisor, Cosgrove, the town clerk, O'Connor, Ott, and two other justices of the peace, besides the highway commissioner. A certificate made by Murphy, the engineer, was produced at that meeting, dated April 8th, recommending that $2,690 be paid to the contractors to pay extra items, which, as therein stated, he had carefully audited and found to be due them. A motion was made and carried at that meeting that a warrant be drawn as recommended. On the evening of that day, Lein called up Savage on the telephone, and wanted him to go to Murphy's office, but it was finally agreed to meet the next day about noon, and the meeting was held accordingly. At that meeting, Lein, the supervisor, Cosgrove, the town clerk, Murphy, the town engineer, and Savage were present. The engineer's certificate of April 8th was produced, and Savage was asked to sign the name of the contractors, which he did. Savage also signed a receipt, as requested. Then Lein asked ·Savage to sign the check or warrant, which Savage refused to do. The check or warrant is as follows:

"West Seneca, N. Y., April 10, 1908.
"West Seneca Sewer Fund, Sewer District No. One.
"Pay to the order of Lawrence Savage & Co. or bearer twenty-six hundred and ninety dollars ($2,690.00), and charge to account of Town of West Seneca.
"H. C. Lein, Supervisor.
"E. H. Cosgrove, Town Clerk.
"Union Stockyards Bank, Buffalo, N. Y."

The warrant or check was handed to Murphy, the engineer, and was indorsed by him, but not by Lawrence Savage & Co., the payee, and was eventually paid by the Union Stockyards Bank. As will be seen, it is payable to the order of Lawrence Savage & Co. or bearer.

Savage and Lein went out together and met Murphy at the corner of Swan and Main streets, outside the Third National Bank. Murphy went into the bank and came out with a paper box, and the three,

Savage, Lein, and Murphy, went to the Prudential Building, where Evans had his office. Savage and Murphy went into Evans' office. Lein did not. The money was counted there. Savage, Murphy, and Evans were present. Evans handed Murphy $250, and said that he, Evans, was not to get anything out of it; that it was all to go to the boys out there. Murphy does not seem to have been quite satisfied. Savage says Murphy made a little kick about it; said it was not enough, but he left the office with the $250. Evans handed a parcel to Savage, and told him to meet Lein at a certain saloon or restaurant. He went there, handed the money to Lein, who took it, went into the toilet, came out to the table, and handed Cosgrove a parcel, and, after dinner there, they separated. Savage states that he did not get any of the money. Other testimony and circumstances in corroboration of the testimony of Savage will be referred to later. Upon these facts, it is very clear that the defendant was guilty of grand larceny.

[2] 1. The defendant challenges the testimony of Savage as unworthy of belief, and contends that in any event, Savage being an accomplice, his testimony is not sufficiently corroborated by such other evidence as tends to connect the defendant with the commission of the crime, as the law requires. Code of Criminal Procedure, § 399. Murphy or Cosgrove were not sworn as witnesses, but, both O'Connor and Evans denied having had any such conversations or taken part in any transactions such as testified to by Savage. O'Connor admitted that he was present at the meeting of the town board on March 28th, and knew about the warrant, and presumes, as he states, that it was a settlement in full to that time for all extra work. He also admits being present at the meeting of April 9th, and that he voted to pay the $2,690 extra, notwithstanding the certificate of the engineer and the resolution of the board of March 28th, relating to balance for extras, his explanation being that he was not on the job and did not know whether the contractors had performed the $2,690 worth of extra work between March 28th and April 9th. Evans denies that there was ever any conversation about raising money for the boys. He states that Savage never came to his office bringing a package of money, that no money was counted or divided there, and no such transactions as testified to by Savage ever took place.

It is very clear that the claim was fraudulent, and that the money was obtained thereon under such circumstances as to constitute larceny; and there are many circumstances which connect the defendant with the crime. Lein must have known that this claim was fictitious, or a least the jury could well so find. There had been no order in writing for the extra work upon which the claim was ostensibly based. He was present at the meetings of the board on March 28th and April 9th, and knew that the certificate of the engineer upon which the order of March 28th was issued was the balance for extras. Although he was not sworn on his own trial, his testimony before the grand jury upon the charge against Savage and as a witness on the trial of Savage showed that he was present at those two meetings; that the warrant of April 9th for $2,690 was in his handwriting; that the town clerk signed the warrant in Murphy's office, and that Mur-

phy and Savage were present; that Savage signed the receipt and that Lein had with him the engineer's certificate of April 8th upon which the warrant was issued; and that the warrant was paid out of the sewer fund by the Union Stockyards Bank. Lein was present when the verdict of guilty was announced against Savage, and Savage testifies that after such announcement he walked toward Lein, who was shaking his head, and that Lein said, "Lawrence, stick, stick. We will do all we can for you." The deputy sheriff corroborates Savage to the extent that he saw Savage lean over the rail and talk with Lein, but he did not hear the conversation. That same afternoon Savage went to the district attorney and made a statement. Thereafter, at the suggestion of the district attorney, an interview was arranged between Savage and Lein at Goetz's saloon. There is no doubt but there was such a meeting. It is testified to by the proprietor, the waiters, and a police officer, as well as others. In fact, Ott, who was present and testified as a witness for the defendant, concedes that there was such a meeting. The dispute arises over what took place. Savage and his brother, Neil, testify that after they got into the compartment, in the saloon, Savage said: "Henry, you know damned well you fellows got this money and I never got none of it; and what are you going to do?" To which Lein replied: "I know you didn't, Lawrence, and we will do all we can to get you out of it." An appeal was talked about, and Lein asked how they could help him (Savage). Savage told them the only way they could help him was an appeal, to which Lein replied that he would do all he could to pay for a lawyer, and a lawyer by the name of Keeler was spoken of. Savage's brother went out, ostensibly to see the lawyer. Ott said that he would like to help Savage, but he was in straitened circumstances. Savage's brother, Neil, returned and reported that the lawyer wanted $200, and Lein said, "My God, that is a lot of money;" and asked Neil to go back and see if he could not take a little less. Neil made a pretense of going back to the lawyer and returned, saying that the lowest he would take was $150. Lein said he would give a check for $100, and have O'Connor and Evans get $50, saying that he wondered if the fellow (referring to the lawyer) would take his check, and Neil said yes, and Ott said he had better not write any checks. Ott said, "Don't do that, Henry, don't write no check." Then Lein stated that he would go over to Weed's and get his check cashed for a hundred dollars, and he came back and threw the money on the table, and said, "Get busy," telling him never to mention that he gave him the money. The cashing of the check is corroborated by the person in Weed's store who cashed it, and the money itself was turned over to the district attorney and produced on the trial of the action.

Ott was sworn and testified to this meeting, but denied that the conversation between Lein and Savage took place respecting who got the money. He also testified that Lein did not say that they would do all they could for him, and denied that he told Lein not to give his check, or that Lein cautioned Savage never to mention that he gave him the money. He admitted, however, that Lawrence Savage spoke of being in hard luck, and asked Lein to loan him $200; that

Lein stated that he would loan him a hundred; that Lein asked Savage whether he should give him a check, and Savage said to give him the currency, and that Lein went out and got the currency. I think it unnecessary to go farther into the details of the evidence. I think the testimony of Savage was sufficiently corroborated within the rule to which I have referred.

[3] 2. But it is contended on behalf of the defendant that, if he was guilty at all, it was of larceny, in the nature of embezzlement, while the offense charged in the indictment is that of common-law larceny for the felonious taking and carrying away of the money; and so it is urged there is a fatal variance between the proof and the indictment, that the crime which the proof tends to establish was not charged in the indictment, and the offense which was charged was not proven.

Among the general duties of the supervisor, the Town Law provides that he shall receive and pay over all moneys raised therein for defraying town charges, except for the support of the poor. Town Law (Consol. Laws 1909, c. 62) § 98. And the town board is authorized to audit claims against the town. Town Law, § 133. The supervisor in a sense is its treasurer. Bridges v. Board of Supervisors, 92 N. Y. 570. This sewer system was constructed under the provisions of chapter 816 of the Laws of 1895, which, although a general act, was evidently intended more particularly to meet the needs of this town. It constituted the supervisor, town clerk, justices of the peace, and commissioner of highways of the town, a board with certain powers, among others, to construct sewers, and provides for meeting the expense of the improvement by issuing and selling certificates of indebtedness. The act specifically requires that all moneys derived from such sale shall be kept as a separate fund by the supervisor, "and all orders for the payment of such moneys shall be made by authority of the board, and shall be signed by the supervisor and town clerk, and shall specify on the face thereof the improvement and fund on account of which the same shall be drawn." Laws of 1895, c. 816, § 40. As has been stated, the moneys raised under this act had been deposited in the Union Stockyards Bank, but payments could only be made by authority of the board and upon warrants signed by the supervisor and town clerk.

While the crimes formerly classed as embezzlement and obtaining property by false pretenses now fall within the definition of larceny (Penal Law [Consol. Laws 1909, c. 40] § 1290), this indictment does not so charge the offense. But in this connection it should also be remembered that a person who abets or aids another in the commission of a crime is a principal. Penal Law, § 2. While this warrant was sufficient upon its face to withdraw the moneys from the bank, it was for a fictitious and fraudulent claim and the certificate of the engineer. The resolution of the board and the warrant were merely a trick or device to obtain possession of the money. If Lein himself had gone to the bank with this warrant and drawn the money, put it in his pockets, and then invited Savage and Murphy to pick his pockets and steal the money, he could no more effectually have aided and

abetted in the commission of the crime than he did in the way in which it was done. A custodian of money or property, who aids another in feloniously taking and carrying it away, so as·to constitute common-law larceny on the part of the person who actually takes it, is equally guilty with the taker. It is possible that Lein might have been convicted of larceny in the form of embezzlement, but, as is pointed out in Bishop on Criminal Law, the same act may sometimes amount to larceny at common law and embezzlement under the statute, and, when it does, the offender may be prosecuted upon either charge at the option of the people. 2 Bishop's·Cr. Law (8th Ed.) §§ 328, 329.

The same question as to the form of the indictment was raised and decided against the defendant in the Neff Case. People v. Neff, ·122 App. Div. 135, 106 N. Y. Supp. 747, affirmed 191 N. Y. 210, 83 N. E. 970. While Neff was not the custodian of the money, he was the officer who executed the fraudulent warrant upon which the county treasurer drew his checks upon the bank, where the money was deposited, and by means of which the money of the county in that case was wrongfully paid out; and it was held that defendant there was properly convicted upon an indictment for common-law larceny.

Other points are urged upon our attention by defendant's·counsel, relating to rulings upon questions of evidence, exceptions to the charge, and refusals to charge as requested. Without entering into a discussion of each of them I think. it sufficient to say that they would not justify a reversal.

The jury, who saw the witnesses and heard their testimony, reached the conclusion that the defendant is guilty, and we cannot say that the verdict is against the evidence. The judgment of conviction must, therefore, be affirmed. All concur.